**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | Crim. Action No. 17-254 (FLW) |
| v. | : | **OPINION** |
| VISHALLIE VERASAWMI | : | |

**WOLFSON, Chief Judge**:

Before the Court is defendant Vishallie Verasawmi's ("Verasawmi" or "Defendant") Renewed Motion for Sentence Reduction. Verasawmi requests compassionate release pursuant to the First Step Act ("FSA"), 18 U.S.C. § 3582(c)(1). As set forth herein, Verasawmi has conditions that increase her risk of severe illness from COVID-19, and the Court finds that she is suffering from other serious medical conditions for which she has received repeatedly delayed or otherwise inadequate treatment while in prison. Thus, the Court finds that Verasawmi's COVID-19 risk factors, in combination with the inadequate treatment she is receiving, constitute "extraordinary and compelling" circumstances that justify compassionate release. Verasawmi's motion is **GRANTED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY

A jury convicted Verasawmi of one count of conspiracy to commit mail fraud, 18 U.S.C. § 1349, and three counts of mail fraud, 18 U.S.C. § 1341. ECF No. 41. On September 12, 2018, the Court sentenced Verasawmi to forty-eight months imprisonment and an additional three years of supervised release, with special conditions for mental health treatment. ECF No. 56. Verasawmi

1

was released on bail and ordered to voluntarily surrender at a later date. She then challenged her sentence on appeal, which the Third Circuit denied on November 27, 2019. *United States v. Verasawmi*, 796 F. App'x 85 (3d Cir. 2019).

Due to certain concerning statements Verasawmi made at her sentencing hearing, the Court ordered her to comply with the directions of Pretrial Services, ECF No. 61 at 58–59, and Pretrial Services referred Verasawmi to a hospital for a psychiatric evaluation. After an evaluation, Verasawmi was involuntarily committed to the Trenton Psychiatric Hospital ("TPH"), where she remained through May 8, 2020, approximately twenty months after the date of her sentencing. TPH placed Verasawmi on the most restrictive level of inpatient psychiatric treatment until February 2020, when this Court permitted her to participate in programs on the TPH campus without requiring a police escort outside of her unit.

During her commitment at TPH, Verasawmi contracted COVID-19 and was hospitalized on April 4, 2020, with severe respiratory illness. According to her medical records, because she suffered severe lung damage and low oxygen levels, she was intubated on April 5, 2020, and she remained on a ventilator for sixteen days. She was then discharged from the hospital on May 6, 2020, and after receiving a final psychiatric evaluation, she was discharged from TPH on May 8, 2020. ECF No. 94 at 5. Following a court order reinstating bail, Verasawmi returned home to her mother's care.

The BOP originally designated FCI Dansbury, in Connecticut, as the facility where Verasawmi would serve her sentence. ECF No. 94 at 5; Appendix ["A"] at 238. Due to a variety of medical conditions, which the Court summarizes *infra*, the BOP re-assigned Verasawmi to FMC Carswell, a medical facility in Texas. ECF No. 94 at 5; A240. Before she surrendered to FMC Carswell, Verasawmi filed a motion for compassionate release requesting that the Court permit

2

her to "remain in the community to continue to treat her serious health problems." ECF No. 94 at 42. I denied the motion, concluding that courts are not authorized to grant motions for compassionate release until after a defendant begins serving her sentence. ECF No. 100. Verasawmi surrendered to FMC Carswell on June 28, 2021. ECF No. 102 at 4. On the same day, she sought compassionate release and home confinement from the warden, both of which were denied. *Id.* at 5.

Having exhausted her administrative remedies, Verasawmi filed the instant motion seeking compassionate release from prison and an early commencement of her term of supervised release. The motion identifies a long list of physical and mental medical conditions from which Verasawmi suffered before entering BOP custody, including: lung damage resulting from her COVID-19 infection, requiring Verasawmi to remain on continuous oxygen assistance, *see* ECF No. 102 at 6–7 and A2, 14, 16, 18, 66; vocal cord damage, including diagnosed vocal cord paralysis and subglottic stenosis (a narrowing of the vocal cords),[1] which resulted from intubation, *see* ECF No. 102 at 7–8 and A79, 184–85; cardiac issues, including a "right bundle branch block" that "could be consistent with pulmonary arterial hypertension," *see* ECF No. 102 at 8 and A3; incontinence, which requires her to wear diapers continuously, *see* ECF No. 102 at 8 and A241; back pain resulting from constant coughing, *see* ECF No. 102 at 8 and A190; COVID-19 long-hauler symptoms, including "memory problems, fatigue, episodic coughing, headaches, and migraines," *see* ECF No. 102 at 8 and A206–14; obesity, *see* ECF No. 102 at 9 and A164; liver conditions, including fatty liver disease and an enlarged liver, and diverticulosis (bulges in the digestive tract), *see* ECF No. 102 at 9 and A196; pre-diabetes, *see* ECF No. 102 at 9 and A110, 144; asthma and

---

[1] Verasawmi notes that she underwent surgery in March 2021 to treat her subglottic stenosis, but that the paralysis remains. ECF No. 102 at 8.

migraines, *see* ECF No. 102 at 9 and A249; and mental illness, including pre-sentencing diagnoses for major depressive disorder and general anxiety, as well as reported suicide attempts and ideation, *see* ECF No. 102 at 9–10 and A243, 249.

Since surrendering to FMC Carswell, Verasawmi continues to suffer from the same ailments, and she contends that the BOP is not providing adequate treatment for some of her conditions. With respect to her throat injuries, notwithstanding her March 2021 surgery, a BOP ear, nose, and throat (ENT) physician recommended follow-up surgery, which BOP had not scheduled as of September 2021. ECF No. 102 at 13. Following a urinalysis, Verasawmi received a provisional diagnosis of chronic hematuria, which consists of bloody urine that is caused, in some circumstances, by conditions such as kidney disease. *Id.* There was no indication that BOP had scheduled a follow-up appointment, although Verasawmi notes that a kidney ultrasound was scheduled in October 2021. *Id.* As for her liver and digestive problems, Verasawmi complains there was no indication, as of September 2021, that BOP planned to address these conditions. *Id.* at 14.

Verasawmi also contends that, although she is fully vaccinated, she remains at high risk of contracting COVID-19 again. She cites to relatively low vaccination rates in Texas compared to the national average, as well as relatively high rates of transmission and hospitalization in the county where FMC Carswell is located. *Id.* at 15. She also contends that she is at a particularly severe risk of contracting COVID-19 in confinement, although she does not cite to any statistics demonstrating that positivity rates are high at FMC Carswell compared to other prisons. *See id.* at 16–17. Finally, she notes that several of her conditions, including her lung problems, liver disease, and obesity, place her at a heightened risk of severe illness from COVID-19. *See id.* at 17 (citing Centers for Disease Control, *People with Certain Medical Conditions*,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html).

Verasawmi argues that her medical conditions, both independently and as factors that increase the risks associated with COVID-19, constitute "extraordinary and compelling reasons" to reduce her sentence, particularly given the ostensibly inadequate treatment she has received at FMC Carswell. *See* ECF No. 102 at 1, 14–17. The Government opposes the motion. ECF No. 103.

On May 25, 2022, Verasawmi filed a letter updating the Court on her conditions and reiterating her request for compassionate release. ECF No. 105. She notes that for certain conditions, the BOP is rendering medical care that differs from what she received outside prison: (1) while she was placed on Care Level 4 before entering prison,[2] FMC Carswell placed her on Care Level 3;[3] (2) although she receives psychotropic medication to treat her depression, she is not enrolled in a mental health treatment program; (3) while BOP provides extra toilet paper to address her urinary incontinence, she has not seen a urologist; and (4) even though she uses a CPAP machine at night to address her sleep apnea, she is still waiting to see a pulmonologist for a follow-up appointment, as requested in January 2022. *Id.* at 3–4.

---

[2] Care Level 4 inmates "require services available only at a BOP Medical Referral Center (MRC), which provides significantly enhanced medical services and limited inpatient care. Functioning may be so severely impaired as to require 24-hour skilled nursing care or nursing assistance. Example conditions: Cancer on active treatment, dialysis, quadriplegia, stroke or head injury patients, major surgical treatment, and high-risk pregnancy." *See* Fed. Bureau of Prisons, *Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019), https://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf [last visited June 9, 2022].

[3] Verasawmi's September 2021 motion notes that the BOP placed her on Care Level 4, whereas the May 2022 letter states that the BOP placed her on Care Level 3, and there is no explanation as to whether the BOP reduced her care level for any particular reason.

For other conditions, Verasawmi contends that the BOP is providing inadequate care. Verasawmi had previously received an echocardiogram (EKG) that illustrated blockage consistent with pulmonary arterial hypertension, and during an appointment in January 2022, a cardiologist observed atypical chest pain and bradycardia. *Id.* at 4; May Appendix ["MA"] at 51.[4] The cardiologist ordered a 48-hour Holter monitor and an EKG,[5] as well as a follow-up appointment for three-to-four weeks later with an "[u]rguent" priority level, but no follow-up had occurred as of Verasawmi's May 2022 letter. ECF No. 105 at 4; MA51. Likewise, in January 2022, a neurologist prescribed a twice-weekly "prophylactic sumatriptan injection" to treat Verasawmi's migraines, but the BOP took "several more months . . . to provide this medication," and because it is accessible only in the "pill line," Verasawmi cannot access the medication before her migraines begin. ECF No. 105 at 5. As of her May 2022 letter, she still awaited a neurology follow-up appointment scheduled for April 2022. *See* MA43.

Based on the points raised in her May 2022 letter, the Court was concerned regarding the medical care Verasawmi is receiving at FMC Carswell. *See* ECF No. 107. In an Order dated June 15, 2022, the Court emphasized particular concerns regarding BOP's failure to schedule Verasawmi's follow-up appointments with a cardiologist, pulmonologist, and neurologist. *See id.* at 2. The Court therefore directed the Government to submit updated medical records and, if the

---

[4] Bradychardia is an abnormally slow heartrate that can become severe if the heart is unable to "pump enough oxygen-rich blood to the body." *Bradychardia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bradycardia/symptoms-causes/syc-20355474 [last visited June 9, 2022].

[5] An EKG and a Holter monitor are used to detect heart disease and irregular heartbeats (arrhythmias). *Echocardiogram*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/echocardiogram/about/pac-20393856 [last visited June 9, 2022]; *Holter Monitor*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/holter-monitor/about/pac-20385039 [last visited June 9, 2022]

Government could not show that the enumerated appointments had occurred, the Government was to provide an explanation. *Id.*

The Government submitted its response, along with Verasawmi's updated medical records, on July 8, 2022. ECF No. 110. As of July 8, 2022, Verasawmi had received neither the Holter monitor or EKG ordered in early January, nor the cardiology follow-up appointment scheduled for several weeks later, due to "an administrative failure." *Id.* at 2. The Government reports that Verasawmi was scheduled to receive the EKG and Holter monitor on July 12, 2022, and that the BOP scheduled a cardiology follow-up appointment for July 15, 2022. *Id.* Verasawmi's pulmonology follow-up appointment also had not occurred as of July 8, 2022. *Id.* The BOP typically schedules these appointments with a contract pulmonologist that provides services at FMC Carswell "on a periodic basis." *Id.* Pulmonology services at FMC Carswell are next scheduled for July 29, 2022, but to expedite Verasawmi's care, the BOP scheduled an off-site pulmonology appointment for her on July 14, 2022. *Id.* The Government reports that it does not expect the delay to "result in any adverse medical consequences based on BOP's prior assessments that this . . . is a chronic, as opposed to urgent, condition." *Id.* It also notes that Verasawmi has not recently complained of cardiopulmonary issues, that her oxygen saturation levels have been normal since January 2022, and that a chest x-ray taken on March 24, 2022 "showed '[n]o radiographic evidence of an acute cardiopulmonary process.'" *Id.* (quoting MA114). Finally, the Government reports that on June 21, 2022, Verasawmi attended the neurology appointment originally scheduled for April, at which the neurologist made recommendations regarding the migraine medications Verasawmi should take. *Id.* at 1.

In reviewing the instant motion, the Court will consider all the relevant circumstances, including Verasawmi's medical conditions when she entered FMC Carswell and her status as of July 2022.

## II.   LEGAL STANDARD

A "court may not modify a term of imprisonment once it has been imposed except" in limited circumstances prescribed by statute. 18 U.S.C. § 3582(c); *see Dillon v. United States*, 560 U.S. 817, 825, (2010) ("'[A] judgment of conviction that includes [a sentence of imprisonment] constitutes a final judgment' and may not be modified by a district court except in limited circumstances."); *United States v. Desu*, Crim. No. 18-613, 2021 WL 2012235, at *2 (D.N.J. Apr. 30, 2021). Under one exception, "the court . . . may reduce the term of imprisonment (and may impose a term of probation or supervised release . . . that does not exceed the unserved portion of the original term of imprisonment)" if, "after considering the factors set forth in [18 U.S.C. §] 3553(a)," the court finds that "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Pawlowski*, 967 F.3d 327, 329–30 (3d Cir. 2020). The court "may reduce the term of imprisonment" either "upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."[6] *Id.* Thus, "a defendant seeking a reduction in h[er] term

---

[6] Congress added the provision authorizing defendants—rather than the BOP—to bring motions as part of the FSA. *See* First Step Act of 2018 § 603(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018). Before the FSA was enacted, section 3582(c)(1) only authorized BOP to bring motions for a reduction in the term of imprisonment on the defendant's behalf.

of imprisonment bears the burden of establishing both that [s]he has satisfied 1) the procedural prerequisites for judicial review, and 2) that compelling and extraordinary reasons exist to justify compassionate release." *United States v. Epstein*, Crim. No. No. 14-287, 2020 WL 1808616, at *2 (D.N.J. Apr. 9, 2020).

The United States Sentencing Commission promulgated a policy statement authorizing courts, as relevant here, to grant compassionate release where (1) "[e]xtraordinary and compelling reasons warrant the reduction," (2) "[t]he defendant is not a danger to the safety" of others, and (3) "[t]he reduction is consistent with this policy statement." U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 1B1.13 (U.S. Sentencing Comm'n 2018). An Application Note specifies certain circumstances that qualify as "[e]xtraordinary and compelling," three of which are potentially relevant here: (1) "[t]he defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory)," examples of which "include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia"; (2) "[t]he defendant is . . . suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"; and (3) the BOP finds "extraordinary and compelling reason[s] other than, or in combination with, the reasons described in subdivisions (A) through (C)." *See* U.S.S.G. § 1B1.13, Application Note 1(A), (D).[7]

The Sentencing Commission promulgated the policy statement specifying circumstances that qualify as "[e]xtraordinary and compelling" before Congress enacted the FSA, at which point only the BOP could initiate motions for compassionate release. "[T]he text of the policy statement

---

[7] The other two circumstances apply where the defendant is at least 65 years-old or is a necessary caregiver to her children or spouse. *See* U.S.S.G. § 1B1.13, Application Note 1(B)–(C). Verasawmi does not argue—and the Court does not find—that either provision is applicable here.

[therefore] explicitly limits its application to Bureau-initiated motions." *United States v. Andrews*, 12 F.4th 255, 259 (3d Cir. 2021). For that reason, the "policy statement is not applicable—and not binding—for courts considering prisoner-initiated motions," *id.*, such as Verasawmi's motion here. Nevertheless, the policy statement "remains a relevant and valuable guide" that courts may consider on a prisoner-initiated motion. *United States v. Darby*, Crim. No. 13-631, 2022 WL 1423089, at *2 (D.N.J. May 5, 2022) (citing *Andrews*, 12 F.4th at 260).

## III.   DISCUSSION

### A.   Extraordinary and Compelling Circumstances

Verasawmi contends that her physical and mental medical conditions present "extraordinary and compelling" reasons to reduce her sentence. She argues that these are serious conditions that "substantially diminish[] [her] ability . . . to provide self-care within the environment of a correctional facility and from which . . . [she] is not expected to recover." ECF No. 102 at 19–20 (citing U.S.S.G. § 1B1.13, Application Note 1(A)). In particular, she suggests that several of her medical conditions increase the risks associated with COVID-19. She also contends that, in addition to the risks associated with COVID-19, her medical conditions and purportedly inadequate treatment at FMC Carswell present "extraordinary and compelling" circumstances. The Court will therefore address separately whether either the risks associated with COVID-19, or Verasawmi's medical conditions and treatment more broadly, justify compassionate release.

#### 1.   Risks Associated with COVID-19

Verasawmi has conditions that present a heightened risk of severe illness from COVID-19 but, by themselves, these conditions do not present "extraordinary and compelling reasons" to reduce her sentence. Verasawmi was diagnosed with fatty liver disease, asthma, obesity, and she

presented signs of pulmonary arterial hypertension, each of which increases the risk of severe illness from COVID-19, according to the CDC. *See* ECF No. 102 at 6–10; *People With Certain Medical Conditions*, Centers for Disease Control ["CDC Risk Factors"], https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html [last visited July 12, 2022]. She was also diagnosed with prediabetes. Although the CDC does not list prediabetes as a COVID-19 risk factor, Verasawmi registered a 6.4% A1C level, and any level above 6.4% qualifies as Type II diabetes, which the CDC does list. *See* CDC Risk Factors. And "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases." *See id.* These are serious conditions that are relevant in determining whether Verasawmi's circumstances are "extraordinary and compelling." *See, e.g.*, *United States v. Brown*, Crim. No. 19-29, 2021 WL 4318261, at *4 (D. Del. Sept. 23, 2021) (discussing obesity and hypertension); *United States v. Robles*, Crim. No. 19-4122, 2022 WL 229362, at *2 (S.D. Cal. Jan. 26, 2022) (discussing heart conditions, among others).

Nevertheless, as courts within and outside this district have concluded, vaccination status is an important factor in assessing the risks associated with COVID-19. *See, e.g.*, *Darby*, 2022 WL 1423089, at *5; *United States v. Shumate*, Crim. No. 18-0645, 2021 WL 2374621, at *2 (D.N.J. June 9, 2021) (citing cases and noting "it is appropriate for courts to consider the vaccination status of a defendant when considering compassionate release motions"); *United States v. Turbides-Pena*, Crim. No. 17-339, 2021 WL 2310093, at *3 (D.N.J. June 7, 2021) ("Given that Defendant is fully vaccinated against Covid-19, the risk of that illness due to continued incarceration has been substantially reduced and does not constitute an extraordinary and compelling reason for a reduction in sentence."); *Brown*, 2021 WL 4318261, at *4 ("Although obesity and hypertension could qualify as 'extraordinary and compelling' risk factors for COVID-19, they do not qualify

11

where an inmate, such as Defendant, has already been vaccinated and/or has already recovered from COVID-19"). Here, Verasawmi notes that she is "fully vaccinated," ECF No. 102 at 15, which mitigates her risk of severe illness. *See Darby*, 2022 WL 1423089, at *5; *see also COVID-19 Vaccines Work*, Centers for Disease Control,  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/effectiveness/work.html [last visited July 13, 2022].[8]

Verasawmi's place of incarceration, FMC Carswell, also does not present atypical risks associated with COVID-19. As of July 13, 2022, out of 1,150 total inmates and 455 staff members, 1 inmate and 16 staff members at FMC Carswell were positive for COVID-19. *See* Federal Bureau of Prisons, *COVID-19 Coronavirus* ["*BOP COVID-19 Database*"]  https://www.bop.gov/coronavirus/ [last visited July 13, 2022]; Prison Rape Elimination Act (PREA) Audit Report: FMC Carswell ["Carswell PREA Report"] (Apr. 6, 2022) at 3,  https://www.bop.gov/locations/institutions/crw/prea_crw_0422.pdf. Eight inmates and no staff members have died from the virus at FMC Carswell. *Id.* While the number of inmate deaths from COVID-19 is concerning, six of these deaths occurred before vaccines became widely available

---

[8] Neither Verasawmi's moving papers nor her medical records indicate whether she received a booster. But even assuming she did not, she does not argue that she is unable to receive a booster for medical reasons. Absent such a justification, refusal to receive the vaccine or a booster typically weigh against finding extraordinary and compelling circumstances based on conditions that heighten the risk of severe illness from COVID-19. *See, e.g.*, *Darby*, 2022 WL 1423089, at *6–7.

in spring 2021, and the Court is not aware of any deaths at FMC Carswell resulting from COVID-19 in the past eight months.[9] The rates of vaccination among staff and inmates also appear high.[10]

Thus, although Verasawmi has multiple serious conditions that increase her risk of severe illness from COVID-19, due to her vaccination status and the circumstances at FMC Carswell, her COVID-19 risk factors do not, by themselves, constitute "extraordinary and compelling" reasons justifying compassionate release. *See United States v. Jefferson*, No. 21-2020, 2021 WL 4279626, at *2 (3d Cir. Sept. 21, 2021) (upholding denial of compassionate release where defendant "did not show that he is at a greater risk of infection or that FCI Allenwood places him at a heightened risk," particularly given the "high rates of vaccination among the inmate population and the staff").

---

[9] *See United States v. Tull*, Crim. No. 15-622, 2020 WL 6381250, at *3 n.6 (D.N.J. Oct. 30, 2020) (noting that based on BOP statistics, six FMC Carswell inmates had died from COVID-19 as of October 28, 2020). Two FMC Carswell inmates died from COVID-19 after the vaccine became widely available, but it is not clear whether either inmate had been vaccinated. *See* Bureau of Prisons, *Inmate Death at FMC Carswell* (Oct. 1, 2021), https://www.bop.gov/resources/news/pdfs/20211001_press_release_car.pdf (discussing inmate death on September 30, 2021); Bureau of Prisons, *Inmate Death at FMC Carswell* (June 17, 2021), https://www.bop.gov/resources/news/pdfs/20210617_press_release_car.pdf (discussing inmate death on June 14, 2021).

[10] While no data exists regarding the precise staff and inmate vaccination rates at FMC Carswell, available data allows the Court to make certain estimates. As of April 6, 2022, FMC Carswell employed 455 staff members who may have contact with inmates, and it housed 1,196 inmates as of that date, with an average population of 1,373 inmates over the previous 12 months. *See* Carswell PREA Report at 3. As of June 9, 2022, 402 staff members and 1,593 inmates had been fully vaccinated. *See BOP COVID-19 Database*. Although turnover may affect these numbers, the approximate proportion of staff who are fully vaccinated is 88%, which is higher than the rate among the U.S. population. *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html [accessed on June 9, 2022] (reporting that as of July 13, 2022, 67% of eligible Americans were fully vaccinated). For inmates, the Court is unable to calculate a precise inmate vaccination rate due to presumed turnover, but the Court notes that more inmates have been vaccinated since vaccines became available than the average number of inmates housed in the prison between April 2021 and April 2022.

Nevertheless, as set forth *infra*, her COVID-19 risk factors combined with the inadequacies in treatment she is receiving at FMC Carswell justify compassionate release.

### 2. Broader Medical Conditions and Treatment

Verasawmi also argues that her COVID-19 risk factors, combined with inadequate treatment she has received in connection with other serious medical conditions, more broadly constitute "extraordinary and compelling" reasons to reduce her sentence. Two types of "extraordinary and compelling" circumstances enumerated in the Sentencing Guidelines are potentially relevant: first, where the defendant is suffering from a "serious physical or medical condition" that "substantially diminishes [her] ability . . . to provide self-care" in a prison, U.S.S.G. § 1B1.13 Application Note 1(A)(ii); and second, where the defendant presents "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)," *id.* Application Note 1(D).[11] Verasawmi contends that her circumstances are "extraordinary and compelling" under these provisions because the BOP is failing to provide adequate medical treatment in several areas. The Court agrees.

Verasawmi's medical conditions are undoubtedly serious. In addition to the conditions that increase her risk of illness from COVID-19, she is suffering from severe lung and throat damage following her COVID-19 infection and subsequent intubation, which requires her to use portable oxygen; longstanding psychiatric challenges, including major depressive disorder and past suicide

---

[11] Although the catchall provision in subdivision (D) technically applies only following a determination by BOP, the Court finds persuasive other decisions in this Circuit concluding that courts may consider subdivision (D) on a prisoner-initiated motion, as the Commission promulgated subdivision (D) before Congress enacted the prisoner-motion process in the First Step Act. *See, e.g.*, *United States v. Rodriguez*, 451 F. Supp. 3d 392, 395–400 (E.D. Pa. 2020).

attempts; heart irregularities that are consistent with pulmonary arterial hypertension;[12] migraines; and incontinence. *See* ECF No. 102 at 6–10, 13. The Government responds in part that Verasawmi's medical conditions do not rise to the level of those specified in the Sentencing Guidelines, such as "terminal illness[es]" including "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." ECF No. 103 at 10–11 (citing U.S.S.G. § 1B1.13, Application Note 1). But Application Notes 1(A)(ii) and 1(D) are not limited to "terminal illness[es]," which are covered under a separate provision. *See id.* Application Note 1(A)(i); *see also United States v. Hoover*, Crim. No. 18-00188, 2021 WL 531960, at *3 (W.D. Pa. Feb. 12, 2021) (considering "non-terminal medical conditions" under Application Note 1). Accordingly, the Court finds that Verasawmi's medical conditions, taken together, could provide a basis for compassionate release in certain circumstances.

Several courts have concluded that the failure to provide necessary treatment or undue delays in treating serious medical conditions may present "extraordinary and compelling reasons" warranting compassionate release. *See, e.g.*, *United States v. Beck*, 425 F. Supp. 3d 573, 580–84 (M.D.N.C. 2019); *United States v. Almonte*, Crim. No. 05-58, 2020 WL 1812713, *6–7 (D. Conn. Apr. 9, 2020); *see also Robles*, 2022 WL 229362, at *2. In *Beck*, after the defendant presented bumps on her breast consistent with breast cancer, the BOP waited eight months to schedule a biopsy, which confirmed that the bumps were cancerous. 425 F. Supp. 3d at 581. By the time the BOP scheduled the defendant for surgery two months later, the "disease had metastasized . . . and

---

[12] Pulmonary arterial hypertension causes blood vessels in the lungs to narrow and become blocked, requiring the heart to work "harder to pump blood through the lungs," which "eventually causes the heart muscle to become weak and fail." *Pulmonary Hypertension*, The Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/pulmonary-hypertension/symptoms-causes/syc-20350697 [last visited July 13, 2022]. "In some people, pulmonary hypertension slowly gets worse and can be life-threatening." *Id.*

[the defendant] required a radical mastectomy." *Id.* Following her surgery, the BOP "disregarded her surgeon's order of a follow-up visit after one week and did not return her to the surgeon for six weeks." *Id.* The BOP also "delayed scheduling an oncology appointment for five months, and as a result," the defendant was "unable to obtain the benefits of chemo or radiation therapy." *Id.* For these reasons, *Beck* concluded that "the quality of treatment" the BOP provided to the defendant was "abysmal" and that the BOP's "gross mismanagement of medical care" for the defendant's "deadly disease" constituted "extraordinary and compelling" circumstances justifying release. *Id.* at 581–82.

In *United States v. Almonte*, the court followed *Beck* and granted compassionate release after the BOP repeatedly delayed surgery to treat the defendant's serious spinal condition. *See* 2020 WL 1812713, *6–7. The defendant had broken his neck just before entering prison in 2005, requiring "vertebrae fusion surgery," and in 2015, while he was still in prison, his condition began deteriorating, leading a spine specialist to recommend an MRI. *Id.* at *6. However, the defendant did not receive an MRI until June 2018, at which point an orthopedist concluded that the defendant required an "urgent surgical consult" for spinal decompression surgery. *Id.* Several months later, in October 2018, BOP staff submitted an "urgent" request for surgery within the next 14 days, and when the defendant saw a surgeon the following month, the surgeon recommended a "large cervical reconstruction" procedure. *Id.* But the "BOP never followed up on [the referral]." *Id.* at *7. Over the next year and a half, the BOP periodically noted that the defendant was supposed to receive spinal surgery, but the surgery never occurred. The court therefore concluded that the "BOP's indifference" to the defendant's serious medical condition constituted "extraordinary and compelling" circumstances, and it reduced the defendant's sentence to time served. *Id.* at *7, *9.

And, in *United States v. Robles*, the court also granted compassionate release where BOP failed to provide urgent medical treatment for the defendant's serious medical condition. 2022 WL 229362, at *2. There, the defendant had experienced five strokes in the past year and a half, suffered from an "incurable blood vessel condition in her lungs" that required multiple surgeries to place coils in her vessels, and had been diagnosed with a patent foramen ovale—effectively "a hole in her heart"—that required "immediate open-heart surgery." *Id. Robles* granted compassionate release in part because the defendant had "not received the consistent care, monitoring, and treatment required for her conditions," including the "much-needed heart surgery," which FMC Carswell had yet to schedule. *Id.*

A motion for compassionate release premised on the BOP's "indifference" to an inmate's medical conditions or failure to provide adequate care bears similarities to claims under the Eighth Amendment for "deliberate indifference" to a prisoner's "serious medical needs." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017). In that context, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017). "[N]egligent treatment or even medical malpractice do not trigger the protections of the Eighth Amendment," *id.* (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)), and "courts 'disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment.'" *Palakovic*, 854 F.3d at 227–28 (quoting *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979)). Nevertheless, a plaintiff can establish deliberate indifference by showing that prison officials "opt[ed] for 'an easier and less efficacious treatment' of the inmate's condition," *Palakovic*, 854 F.3d at 228 (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)), "'den[ied] reasonable requests for medical treatment . . . [when] such

denial expose[d] the inmate to undue suffering or the threat of tangible residual injury,'" *Palakovic*, 854 F.3d at 228 (quoting *Monmouth Cty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987)), or "delayed" "necessary medical treatment . . . for non-medical reasons." *Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346.

In light of the foregoing case law, the severity of Verasawmi's various conditions, combined with the delays and inadequacies in her treatment, constitute "extraordinary and compelling" circumstances warranting early release. She has identified multiple areas in which the BOP either neglected to provide urgent treatment its own healthcare professionals had recommended or repeatedly delayed for months in providing scheduled care. After presenting BOP with medical records documenting EKG results consistent with pulmonary arterial hypertension, which can be life threatening, a cardiologist observed atypical chest pain and bradycardia during an appointment on January 4, 2022. *See* ECF No. 105 at 4; MA51. The cardiologist ordered a Holter monitor, another EKG, and a follow-up appointment in three-to-four weeks, which the cardiologist classified as "[u]rgent." MA51. Yet, the Government reports that Verasawmi never received the Holter monitor or EKG, let alone the follow-up appointment with a cardiologist, due to an "administrative failure." ECF No. 110 at 2. Only after this Court intervened did the BOP schedule Verasawmi to receive a Holter monitor and an EKG on July 12, 2022, and it scheduled a follow-up appointment for July 15. *Id.* But the Court has not received any update from a healthcare professional as to the effect of the delay on Verasawmi's condition, which was first detected in March 2021. *See* A2. And it is evident that, had the Court not intervened, the "urgent" care Verasawmi's physician ordered would have continued to fall through the cracks.

Though not as egregious, there have been similar delays in treating Verasawmi's other conditions. For example, she suffers from migraines, and on January 7, 2022, a neurologist

prescribed a twice-weekly prophylactic injection, which differs from the treatment she received outside the prison setting and requires Verasawmi to access her medication in a "pill line" only after her migraines set in. *See* ECF No. 105 at 5. The Court generally defers to treatment decisions by the BOP's healthcare professionals, *Palakovic*, 854 F.3d at 227–28, and as the Government emphasizes, migraines are a chronic condition that healthcare professionals can manage with treatment. But the BOP delayed for several months in providing the medication prescribed in January. And a follow-up neurology appointment connected to Verasawmi's migraines, which the BOP originally scheduled for April 20, 2022, was delayed by two months as well. *See* ECF No. 110 at 2. Verasawmi also has asthma, and she incurred severe lung damage due to her COVID-19 infection, which required her to remain on continuous assisted oxygen. *See* ECF No. 105 at 4; MA40, 49. The BOP removed her nocturnal oxygen supply in December 2021 due to improvements in her condition, *see* ECF No. 105 at 4; MA40, 43, 49, and the Court does not second-guess this decision. *See Palakovic*, 854 F.3d at 227–28. But here again, the BOP did not schedule a pulmonology follow-up appointment until nearly four months after the April 1, 2022 target date. *See* MA49; ECF No. 110 at 2. The Court recognizes that the BOP only schedules contract pulmonology appointments periodically. *See* ECF No. 110 at 2. But given the severity of Verasawmi's lung damage, the serious potential complications of which her physician warned before she entered BOP custody, *see* A2, and the risks posed by COVID-19 variants, the Court is concerned about the level of pulmonary care Verasawmi is able to receive in prison.[13]

---

[13] Verasawmi's motion also notes that an ENT had recommended follow-up throat surgery in August 2021 to treat her subglottic stenosis, which BOP had not scheduled as of September 2021. ECF No. 102 at 13. However, her medical records reflect that she received a "CT scan of the neck to evaluate the subglottic space" on December 21, 2021. MA111. At an ENT consultation on April 13, 2022, the ENT recommended against additional surgery, finding that "[n]o further intervention is needed at this point unless [her] symptoms clinically change." *Id.* And in her May 2022 letter, Verasawmi does not raise any additional issues in the treatment she is receiving for this condition.

Verasawmi also identifies areas where the BOP is providing care that differs in certain respects from what she received before entering prison. *See* ECF No. 105 at 3–4. One notable issue pertains to mental health. After concerns arose around the time of her sentencing, Verasawmi was involuntarily committed to TPH, where she spent over a year in the most restrictive level of inpatient psychiatric treatment. She was diagnosed with major depressive disorder, and in prison, she notes that she is receiving psychotropic medication, but that she is not enrolled in a mental health treatment program, as she was before entering BOP custody. *See* ECF No. 105 at 3–4; MA 77, 90. Given the apparent severity of Verasawmi's mental health condition, the discrepancy in treatment compared to what she received outside prison adds to the Court's concerns regarding the level of care Verasawmi is receiving at FMC Carswell.

Although none of the foregoing medical issues independently constitutes extraordinary circumstances, the compounding effects lead the Court to conclude that Verasawmi is "not receiv[ing] the consistent care, monitoring, and treatment required for her conditions." *See Robles*, 2022 WL 229362, at *2. This case undoubtedly differs from *Beck* and *Almonte*, where each defendant suffered from a single life-threatening or debilitating condition that the BOP repeatedly failed to treat. *Beck*, 425 F. Supp. 3d at 581–82; *Almonte*, 2020 WL 1812713, *6–9. But similar to *Robles*, Verasawmi suffers from a wide range of serious medical issues, some of which place her at heightened risk of severe illness from COVID-19, and others of which independently place her at risk of serious health complications or cause significant pain. *See Robles*, 2022 WL 229362, at *2. Across many of these conditions, the BOP has delayed in providing the treatment Verasawmi's physicians have ordered without any medical justification. *See Monmouth Cty. Corr. Inst. Inmates*, 834 F.2d at 346. Most notably, the BOP simply failed to schedule "urgent" cardiac treatment

Verasawmi's cardiologist ordered in January 2022, and the Court has not received information from a healthcare professional concerning the status of Verasawmi's condition. *See* ECF No. 110.

The Court is particularly concerned that only its intervention prompted the BOP to provide the care Verasawmi's physicians had recommended. There is no indication that Verasawmi's health has yet deteriorated to the extent at issue in the foregoing cases, and the results of her upcoming appointments may in fact demonstrate improvement. But the record indicates that without the Court's intervention, Verasawmi may well have been on a trajectory toward outcomes similar to those that occurred in *Beck* and *Almonte*. And the record provides cause for concern that, without further intervention by the Court, omissions or delays in treatment would continue. In these atypical circumstances, where Verasawmi suffers from a complex array of serious conditions, some of which the BOP has failed to treat diligently, the Court cannot simply wait until those outcomes materialize. The Court acknowledges the demands placed on the BOP and appreciates the Government's efforts to expedite Verasawmi's delayed appointments. Nevertheless, taken together, the factors outlined herein cast substantial doubt on whether the BOP is able to "adequately manag[e] [Verasawmi's] medical care." *United States v. Wax*, Crim. No. 14-251, 2020 WL 3468219, at *3 (D.N.J. June 25, 2020).

### B.   Section 3553(a) Factors

The Court also considers the factors under Section 3553(a). Although one factor weighs against release, it is not dispositive, and on balance, the factors confirm my decision under Section 3582 that early release is warranted.

For many of the factors, the Court's analysis at the sentencing hearing remains applicable on this motion and favors release at this stage. Regarding the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), although Verasawmi's role in defrauding her employer of over

$1 million is a "very serious matter," her crime was non-violent, and the Court accounted for the fact that she was not the principal actor. ECF No. 95-1, Tr. 47:16–48:10. With respect to her personal history and characteristics, 18 U.S.C. § 3553(a)(1), the Court recognized that she had spent years becoming educated and working in various jobs, including positions as a driver and deliverer after losing her previous position in connection with the charges she faced. ECF No. 95-1, Tr. 48:14–49:2. The Court also accounted for the fact that Verasawmi required mental health treatment, *id.* Tr. 49:3–11, which remains a condition for which she requires continuing treatment. As for deterrence, the Court noted the importance of general deterrence in fashioning a sentence, but I did not perceive any risk that Verasawmi would recidivate. *Id.* Tr. 51:22–52:5. Taken together, these factors favor early release.

The risk of creating disparities across sentences weighs against compassionate release but is not dispositive. The Court sentenced Verasawmi to a term of imprisonment below the Guidelines range, and granting a sentence reduction on top of a variance can create unwarranted sentencing disparities. *See United States v. Fraction*, 855 F. App'x 72, 73 (3d Cir. 2021) (emphasizing that the defendant's "sentence already included a significant downward variance from the guidelines range"); *United States v. Wall*, Crim. No. 16-533, 2021 WL 822803, at *5 (D.N.J. Mar. 4, 2021). Verasawmi has also served only approximately 12 months of her 48-month sentence, or 25% of her full term, which also "weigh[s] against relief." *Fraction*, 855 F. App'x at 73 (citing *Pawlowski*, 967 F.3d at 331); *United States v. King*, Crim. No. 18-379, 2021 WL 3783157, (D.N.J. Aug. 24, 2021) ("Defendant has served less than half his sentence, which also militates against release."). But *Pawlowski* notes that the portion of a sentence served may carry less weight where the total sentence is relatively short. *See* 967 F.3d at 331 n.7 (comparing 1-year sentence in a case where a court granted compassionate release to the 15-year sentence at issue in *Pawlowski*). The Court

does not interpret *Pawlowski* as concluding that the portion served is irrelevant in the context of a shorter sentence. Nevertheless, the relatively short length of Verasawmi's sentence compared to the defendant's in *Pawlowski* mitigates, to a certain extent, the concerns *Pawlowski* outlines. *See id.*; *see also Robles*, 2022 WL 229362, at *1–2 (granting compassionate release where defendant had served approximately half of an 84-month total custodial sentence).

Other circumstances further mitigate the risk of sentencing disparities. Before beginning her sentence, Verasawmi spent 20 months receiving inpatient psychiatric treatment in civil confinement at the most restrictive level, and she spent another 13 months receiving medical care at home following her COVID-19 infection. *See* ECF No. 102 at 21–22. In granting the present motion, the Court will also order Verasawmi to remain on home confinement for the remainder of her term of imprisonment. The Court recognizes that neither Verasawmi's civil commitment and home care, nor her home confinement following her release, are part of her formal sentence. Only "the Attorney General, acting through the Bureau of Prisons, has the authority to determine whether a defendant is entitled to . . . credit [pursuant to 18 U.S.C. § 3585(b)] in the first instance." *United States v. Romero*, 348 F. App'x 803, 805 (3d Cir. 2009) (citing *United States v. Wilson*, 503 U.S. 329, 334 (1992)). And there is no indication that Verasawmi has exhausted her administrative remedies by requesting credit from BOP. *See Romero*, 348 F. App'x at 80 (citing *United States v. Brann*, 990 F.2d 98, 103–04 (3d Cir.1993)). But in considering possible disparities resulting from her release under the Section 3553 factors, the Court nevertheless accounts for the fact that Verasawmi faced unusually difficult and restrictive conditions for at least 20 months before beginning her 48-month sentence, and that she will remain in home confinement until her term of imprisonment ends.

Accordingly, the Court finds that the factors under Section 3553 support release.

## IV.  CONCLUSION

For the reasons set forth above, Defendant's Motion for Sentence Reduction is **GRANTED**. An appropriate form of Order is filed herewith.

Date: July 15, 2022

/s/ Freda L. Wolfson
Hon. Freda L. Wolfson
U.S. Chief District Judge